IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ILED IN CLERK S OFFICE
U.S.D C - Atlanta

JUL 28 2006

LUTHER D. Thomas, Clerk
By: _____
Deputy Clerk

| | |
|---|---|
| JOSEPH McADAMS, JBM, LLC,<br>FLORIAN HOMM, ABSOLUTE<br>RETURN EUROPE FUND, LTD.,<br>THE LOYR FOUNDATIONS,<br>EUROPE CATALYST FUND AND<br>RICHARD SMYTH,<br><br>PLAINTIFFS,<br><br>vs.<br><br>GREENBERG TRAURIG, LLP,<br>and ROBERT ALTENBACH,<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.:

**1 06 CV 1778**

**COMPLAINT**

**COME NOW** Plaintiffs ("Plaintiffs") and hereby file their Complaint:

## I.     Parties

**Plaintiffs**

1.     Plaintiffs, Joseph McAdams ("McAdams"), Florian Homm ("Homm") Absolute Return Europe Fund, Ltd., the Loyr Foundations, Europe Catalyst (collectively referred to as the "Fund" or "Homm Entities") and Richard

Smyth ("Smyth") were investors in UCAP, Inc. ("UCAP"), which had a principal place of operation in Arkansas.

2.     McAdams is a resident of Arkansas and a shareholder of UCAP. McAdams, individually and through JBM Company, LLC, ("JBM") invested a total of $3,050,000 in UCAP from October 6, 2001 to March 17, 2003. McAdams served as an outside director of UCAP from October 2001 to September 11, 2003.

3.     At all relevant times, Smyth was, and is, a resident of Florida and a shareholder of UCAP. Smyth invested a total of $2,000,000 in UCAP in December, 2003, by accepting UCAP stock to settle litigation claims based upon material misrepresentations and omissions of material fact, as alleged below.

4.     At all relevant times, Homm was, and is, a resident of Majorca, Spain and a shareholder of UCAP. Homm and the Homm entities which he managed, to wit: Absolute Return Fund, Ltd., the Loyr Foundation and Europe Catalyst Fund (purchased UCAP securities from December, 2001 to February 19, 2004, as specifically alleged below. Homm invested a total of $6,180,000 in UCAP, based upon material misrepresentations and omissions of material fact, as alleged below.

5.     At all times pertinent herein UCAP was a publicly-traded company required to file periodic reports with the SEC under the Securities Exchange Act ("SEA") of 1934, as amended. At all times pertinent herein, UCAP was operated and controlled by William McCord ("McCord") and Dan Moudy ("Moudy"), with the participation and assistance of Lynn Bradley ("Bradley"), David Colwell ("Colwell"), and others. All of these individuals are sometimes referred to in this Complaint as the "Arkansas Four". An additional participant was Scott Demerau ("Demerau"). At all times pertinent herein, UCAP stock was traded on the Over-the-Counter Bulletin Board Market until July, 2005 at which time UCAP's stock was de-listed by the SEC.

**Defendants**

6.     Defendant Greenberg, Traurig, LLP ("GT") is a large law firm with its headquarters in Miami, Florida and an office in Atlanta. Defendant Robert Altenbach ("Altenbach") is a partner of GT and, with Defendant GT, was an active participant in the scheme to defraud. Defendant GT and Defendant Altenbach are sued both as primary violators and for aiding and abetting others as set forth herein. Both Defendants are subject to the jurisdiction of this Court and venue is proper as to these Defendants since

many of the activities and transactions giving rise to this Complaint occurred in Atlanta, Georgia.

## II. Jurisdiction and Venue

7.     This Court has original jurisdiction under §28 U.S.C. 1331 as Plaintiffs' claims arise under the Constitution, treaties or laws of the United States, namely Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b).

8.     Plaintiffs have specifically alleged that Defendants violated 15 U.S.C. §78j(b), Rule 10b-5 of the Securities and Exchange Commission, and 17 C.F.R. §240.10b-5 in connection with the purchase and sale of securities, by (a) employing "devices, schemes and artifices to defraud," (b) making "untrue statements of material facts and omit[ing] to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," and (c) engaging "in acts, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities." Plaintiffs' claim for relief under these provisions is subject to the exclusive jurisdiction of this court pursuant to 15 U.S.C. §78aa.

9.     This Court has jurisdiction over all issues raised in this proceeding, including the Plaintiffs' state law claims, under 28 U.S.C. §1441(c).

### III. Facts

10.     Plaintiffs allege that McCord, Moudy and other principal officers of UCAP, along with Defendant GT and the accounting firm for UCAP, Moore Stephens Frost ("MSF"), pulled off a massive fraudulent scheme which lasted three years, involving publishing to the investing public false and misleading filings with the SEC, including false financial statements, issuing misleading press releases and engaging in a huge "pump and dump" plan in which they used UCAP's stock to enrich themselves.

11.     Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business alleged in this complaint.   Defendants, acting individually and in concert with others, perpetrated an ongoing, massive fraud against Plaintiffs and other investors. The acts were committed by Defendants in an attempt to induce individuals, including Plaintiffs, to invest in UCAP.  Defendants' actions were also taken in an attempt to manipulate the price of shares of UCAP to their benefit and

to avoid the recognition and detection of the true insolvent financial condition of UCAP and its subsidiaries.

12.    Defendants and the Arkansas Four ran a public relations campaign designed to convince the investing public that UCAP's business was solid, growing rapidly and a good investment. UCAP was a multi-state provider of mortgage lending and brokerage services and also held certain investments in real estate. UCAP previously operated under the name of Lahaina Acquisitions, Inc. During the time period relevant to this lawsuit, UCAP's primary operations were conducted through United Capital Mortgage Corporation ("UCMC") its wholly owned subsidiary.   UCMC was an Arkansas corporation, a full-service residential mortgage lender, providing conventional, FHA, VA and second mortgage loans to consumers. UCMC had approximately 200 employees and generated substantial revenues for UCAP. UCMC's business was funded by a warehouse line of credit issued by GMAC Residential Mortgage Funding Corp. ("RFC").  McCord owned a majority interest in UCMC prior to October 1, 2001, after which, UCAP acquired all of the outstanding stock of UCMC. McCord therefore became a super majority shareholder and control person of UCAP. McCord was the

sole guarantor of the RFC warehouse line of credit, until June, 2002, when he caused UCAP to join him as guarantor.

13.    The Arkansas Four were aided and abetted in their scheme and conspiracy by Defendants GT, Altenbach, MSF and others who benefited financially from UCAP, and knew they added credibility to the business transactions of UCAP.

14.    During the period from November, 2001 until April, 2004, the Arkansas Four controlled UCAP and its subsidiaries. The control exercised by the Arkansas Four, allowed them to keep the true financial condition of UCAP hidden from Plaintiffs, outside directors, investors and the SEC.

15.    McCord and Moudy, with the help of Defendant Altenbach and Defendant GT, developed and implemented a series of corporate transactions designed to confuse the public and make it extremely difficult to understand UCAP's financial statements. Their purpose was simple – convince investors such as the Plaintiffs that UCAP was a thriving, growing business which justified their investment.

16.    The Arkansas Four used UCAP as a personal piggybank, artificially inflating UCAP's stock price, and then selling millions of dollars of shares. They also used UCAP to pay hundreds of thousands of fees to themselves

and professional firms such as Defendant GT. In order to achieve their goals, the Arkansas Four needed the active cooperation of Defendant Altenbach and Defendant GT to prepare the legal documents and public filings as well as bless the financial statements.

17.     Defendants assisted McCord and the Arkansas Four in:

- issuing shares and warrants to purchase shares of UCAP to the Arkansas Four and relatives at cheap prices, including a warrant to purchase ten (10%) percent of UCAP at below market prices;

- engaging in sham real estate transactions for no other purpose than to generate the illusion of profits;

- changing stock option prices and exercise dates;

- preparing and issuing false and misleading press releases; and arrange for and execute highly diluted financings without proper disclosure;

- engaging in unbridled insider trading.

**Stock Transactions**

18.     During the period from January 2, 2003 to February 28, 2003, Defendants GT assisted UCAP and the Arkansas Four in a series of improper and illegal issuances of stock involving over 5 million shares,

immediately after preparing and filing documents with the SEC which misstated the true financial condition of UCAP.

19.     Defendant Altenbach devised a plan designed to totally avoid the requirements of the SEC for registration of stock by UCAP by using to using, and substantially abusing, a provision for employee stock options known as an S-8 Registration.

20.     Most all of these shares were issued using a fraudulently created Consulting Agreement, dated July 9, created on October 31, 1999 by Steve Cunningham, a former GT partner, and Defendant Altenbach.  By creating the document, Defendant Altenbach hoped to avoid the required accounting for the costs associated with stock issuances, as well as other disclosures.

21.     Most of the shares went to insiders, directly as 'employees' of UCAP, or into special purpose entities, where the stock was sold into the market, to fill wallets, and sometimes pay obligations of the company that the Arkansas Four did not want to make public. Some of the shares though went to contractors – investor relations contractors who got paid in stock to pump the price and volume of the stock to cause investors to believe it was a good investment – a direct violation of SEC rules that govern such issuances.

22.    During the time the stock was issued and sold into the market, the financials of the company were seriously flawed in a number of ways, including understating costs of stock issuance in excess of $15,000,000, $6,000,000 in fraudulent real estate sales, and over $12,000,000 in understated costs.  Despite these facts, over 30 million shares were issued by UCAP, all with opinion letters drafted by Defendants, allowing these issuances to occur – including over 400,000 shares of stock and under-priced options to Defendant Altenbach himself, and resulting in payment of nearly $1 million of billings to Defendant GT.

23.    Defendant Altenbach also devised a plan to have UCAP 'sell' assets to a special purpose entity known as Accent Associates, LLC, controlled by an employee of UCAP.

24.    After default and litigation, UCAP settled litigation over this transaction on February 15, 2002, by agreeing to transfer 1,600,000 shares of free trading stock and $1,100,000 of cash. The value of the stock at that time was approximately $1.30 per share, or $2,080,000. When taken at full value, the consideration paid was $3,180,000, almost $2 million more than the original $1.25 owed. Yet, UCAP actually reported a profit of $178,573 on the transaction!

**Sham Real Estate Transactions**

25.    Over $6,000,000 in real estate revenue was recorded on Form 10K

SEC filings, drafted by, edited by, and recorded by Altenbach.  These sales

were all reported and accounted for as if there were typical, arms-length

commercial transactions to third parties.  Upon information and belief, there

were never any sales to unrelated third parties in the history of UCAP. Each

and every one of these transactions involved the movement of title to a

property into a 'special purpose entity' controlled by the Arkansas Four,

with the supervision, documentation and approval of Defendant Altenbach,

as officer, director and corporate counsel.  No valid consideration changed

hands, and the properties went on to the books of UCAP at grossly inflated

values.

26.    The most compelling example of the fraudulent nature of these

transfers is exemplified by the December, 2000 transaction in which UCAP

allegedly 'acquired' the personal residence of Demerau for $8 million,

transferring $2,500,000 of debt already on the house to UCAP to push profit

into a prior quarter.

27.    This '$8 million' property was added to the books of UCAP; in

summer 2002.  UCAP later added more debt to the property, placing

$3,800,000 of debt on the property in a refinancing transaction with its primary lender, using inflated appraisals. Upon information and belief, the excess cash did not go to pay the obligations of UCAP, but instead went to insiders and Defendant Altenbach. Ultimately, in 2004 the lender foreclosed on the property, and resold it for $2.1 million, less than the original debt assumed by UCAP.

28.    In February 2000, UCAP reported selling a property called 'Beachside', acquired in the August 1999 merger. In the February 2000 transaction, the buyer assumed $1.8 million of existing debt and tendered 660,000 shares of then restricted stock in UCAP for the equity in the property in what should have been a 'flat' transaction, showing no profit or loss. Instead, Defendant Altenbach created an elaborate note secured only by the stock, grossed the value of the property up to $3,600,000 – a 20% gain over the true and actual verified value, and used the purported value of the stock as a measure, to report $1,500,000 profits. Ultimately, with the end of the fiscal year approaching, and in default of the agreement with the buyer, Altenbach transferred the 'note' and the stock to Demerau in the same transaction that created $6 million of inflated assets to the books of UCAP,

and avoided a write off of over \$1.5 million of the fictitious profit from 12 months earlier.

29.     In January 2003, with a planned major stock promotion effort underway, Altenbach authored, reviewed and published, using financials fraudulently created by MSF, the Annual Report for the FY2002 period ended September 30, 2002, including in his report a sale of one lot at Swiss Air for \$500,000.  Allegedly, the lot had been 'sold' to an insider in exchange for stock that was allegedly owed to the insider.  This transaction allowed UCAP to recognize a \$550,000 sale and \$481,000 profit, when in fact no such commercial sale really occurred.

**Stock Options**

30.     On many occasions, including on July 3rd, 2000, Altenbach authorized and documented a change in the exercise price of stock options previously approved for issuance on June 30th, 2000, changing their 'issuance' date to be June 13th at \$1.20 per share, instead of June 15th at \$2.13 per share, providing each insider, including himself, an additional profit of almost \$1.00 per share, and hiding that same expense from the shareholders.

31.     On April 20, 2001, and again on July 27, 2001, he authorized, documented and issued shares and a warrant to McCord, calling for the

issuance of 4,000,000 shares of stock, at $.001 per share, at a time when the value of the stock was trading around $.60 per share. This issuance of $2.4 million of stock, and other shares issued in April, almost 15% of the shares of UCAP, was not reported until December 14, 2001, despite federal securities laws that require notification to shareholders within ten (10) days. The cost of those shares was not properly considered in the preparation, audit and release of the financials of UCAP, by Altenbach, thus hiding from the public, and the Plaintiffs, another $2,000,000 of expense incurred but not reported by Altenbach, the secretary, board member, and SEC counsel to UCAP.

**Puffy Press Releases**

32.    Altenbach, as SEC counsel for UCAP, not only reviewed press releases for UCAP, but actually drafted them, including releases that provided puffy, misleading information about the financial condition of UCAP, as set forth in GT's billing records.

33.    These press releases were aimed at making the company appear more creditable so that the sales volume of shares of UCAP would increase, making it easier for Defendant Altenbach and other insiders to profit from sales.

- 14 -

34.     Upon information and belief, one of the primary reasons the Arkansas Four engaged in the scheme and conspiracy to defraud Plaintiffs and others was to enable UCAP to continue its lending arrangement with its primary lender, RFC.  Pursuant to a warehouse line of credit agreement, RFC required UCAP to meet certain financial covenants, such as tangible net worth, shareholder's equity, leverage ratios and net income.  McCord personally guaranteed a portion of the RFC line of credit and therefore was highly motivated to make UCAP's financial statements avoid recognition of losses or any facts that would cause RFC any concern about the financial viability of UCAP.

35.     During the period from January, 2000, until April, 2004, the Arkansas Four intentionally manipulated the UCAP income statements and balance sheet to enable UCAP to meet the financial covenants of the RFC loan, including, but not limited to:

    a)     failing to disclose in the summer of 2002 that UCAP had received written notification from RFC that it had breached its tangible net worth requirement;

    b)     failing to properly accrue and set aside reserves for certain judgments obtained against the company;

c)   engaging in a fictitious sale of a lot for $550,000 to McCord without receiving consideration and in order to falsely report $550,000 of income for UCAP;

d)   engaging in related party transfers of real estate in order to generate fictitious revenue and income;

e)   failing to disclose in September, 2002, an impairment write-down of UCAP's assets of $2.5 million;

f)   failing to disclose that UCAP had been notified that it was violating various accounting rules related to revenue recognition;

g)   booking only $400,000 of a required $800,000 adjustment to UCAP's financial statements;

h)   failing to properly expense costs associated with insider transactions, such as the issuance of warrants and cancellation of debt; and

i)   artificially inflating the value of real estate owned by UCAP.

j)   failing to disclose the existence of the "Linfert" judgment, an expense of over $2,000,000, against UCAP; and

k)   understating UCAP operating losses by over $8,000,000.00.

36.    Defendants GT, Altenbach and others engaged in many other acts in furtherance of their conspiracy. These activities included:

    a)    failing to communicate to the outside directors, including Homm and McAdams, the existence of a FAS 91 letter from UCAP's auditors, as well as the need to make an $800,000 adjustment to revenue in order to comply with FAS 91;

    b)    failing to disclose that McCord was a convicted felon, convicted of aiding and abetting gambling, and that he was subject to a disciplinary action by the Arkansas Securities Commissioner;

    c)    failing to disclose that UCAP had entered into a consulting agreement with McCord which paid him $225,000 annually.

    d)    failing to disclose that Colwell suffered from substance abuse and could not function as chief executive officer;

    e)    failing to disclose in Form 8-K filings the existence of a disagreement amongst the directors about certain

accounting treatments in relationship the directors resignation from the board;

f)   failing to disclose that Bradley, UCAP's chief financial officer had embezzled money from McCord and another business venture and was working at UCAP subject to the control of McCord to pay off the debt he owed McCord, thereby severely compromising Bradley's independence as CFO.

g)   preparing false minutes of directors' meetings showing;

h)   filing Form 10K's with the SEC which falsely indicated Plaintiff McAdams had signed them as chairman of the UCAP audit committee;

i)   entering into a contract of indemnity with a title company to induce Plaintiffs McAdams and JBM to invest money in reliance on clear title to the Swiss Air Property;

j)   entering into contracts of guaranty with Plaintiff McAdams to guarantee repayment of over $500,000 invested by him.

37.     The most egregious example of wilful, outright fraud concerns Defendants' actions from January, 2003 until April 15, 2004.   UCAP filed its 10Q for the period ending December 31, 2002 on February 14, 2003.

38.     In a corporate profile dated February, 2003 prepared by a securities firm paid $63,000 by UCAP. which speaks in glowing terms about UCAP, its business and future prospects, UCAP is shown to have reported income for the quarter ending December 31, 2002, of $1,073,900.

39.     In an e-mail dated February 15, 2003, from Lynn Bradley, UCAP's chief financial officer, sent the day after the UCAP 10Q for the first quarter of 2002 was filed with the SEC, Mr. Bradley tells McCord and Moudy:

> "...I have exposed myself as CFO of the Company without question
>
> or reservation.  Who else would have done the things that I have,
>
> subjected themselves to the scrutiny of Rick Smyth and continue to
>
> sign as CFO at what Smyth calls "great personal liability..."

40.     Mr. Bradley goes on to say "Billy, you wanted $1,000,000 to report this quarter – you got it" (Emphasis supplied)

41.     Subsequent events would prove the $1 million of quarterly income was a fraud.  Mr. Bradley, while acting as UCAP's chief financial officer,

was also apparently acting as McCord's personal accountant, a fact never disclosed to the public.

42.    Mr. McCord's personal financial statement for January 31, 2002 shows that Mr. Bradley owed Mr. McCord the sum of $117,250, secured by a mortgage on Mr. Bradley's house.   Upon information, Mr. Bradley had previously embezzled money from another company controlled by Mr. McCord who accepted a promissory note to satisfy the claim.   McCord then caused UCAP to hire Mr. Bradley as the chief financial officer thereby putting Mr. McCord in a position to control Mr. Bradley's activities as UCAP's CFO.   These facts were not disclosed to the Plaintiffs or the investing public.

43.    In October, 2003, the Arkansas Four terminated Mr. Farmer as CEO based upon his disagreement with them over whether UCAP needed to file an amended Form 8-K with the SEC   On October 22, 2003, Mr. Farmer sent a letter to Moudy, in which Mr Farmer demanded UCAP file an amended Form 8-K immediately.

44.    According to the sworn testimony of Colleen Brewer, one of the other officers of UCAP:

- Mr. Farmer wanted UCAP, in October, 2003, to file an 8-K disclosing "the significant difficulties being experienced by both UCAP and the mortgage company and UCAP and the audit issues…'

- Defendants Moudy and McCord disagreed with Mr. Farmer

- The outside lawyer for UCAP "…opposed it because he knew it would be damaging to the company. I think he knew it probably needed to happen but from a personal standpoint he knew it would be damaging to the company and the money he had invested in the company." Defendant Altenbach was that outside lawyer.

45.    From September, 2003 until November, 2003, the Arkansas Four solicited Plaintiff Homm seeking an additional investment by him. On November 24, 2003, Plaintiff Homm agreed to invest an additional $5.1 million pursuant to a Securities Purchase Agreement prepared by Defendants.

46.    Defendants failed to disclose to Plaintiff Homm, among other items, that on September 22, 2003 and October 6, 2003, Richey May and Co. notified UCAP of over forty (40) significant questions and issues relating to accounting transactions and the lack of disclosures by UCAP. Among the items raised by Richey May were:

1.    An undisclosed reduction in equity of almost $3.5 million;

2.    Improper recording of consideration for stock transactions;

3.    Fictitious gain from the sale of a Swiss Air lot;

4.    Failure to disclose the cancellation of $1 million in notes owed by, among others, Demerau;

5.    Improper recording of a $2.5 million "deferred tax asset"; and

6.    Failure to address the issue of whether UCAP could survive as a "going" concern.

47.    UCAP received over $4 million from Homm in the period from November, 2003-April, 2004, in a transaction handled by Defendant Altenbach and Defendant GT, without disclosing to Homm its true financial condition.  On April 22, 2004, UCAP filed the Form 8-K, which, for the first time, disclosed to Plaintiffs and investing public the magnitude and materiality of the misstatements and omissions in the financial information UCAP filed with the SEC for FY 2001, 2002, and the first two quarters of FY 2003.  Within four (4) months of the receipt of over $5 million from Plaintiff Homm, UCAP had spent all of the proceeds and was out of business.

48.   Upon information and belief, Defendant GT received almost $250,000 from the Homm proceeds to pay its outstanding bills, and McCord received almost $750,000.

## V. Claims for Relief

### COUNT I – FRAUD

**Violations of Section 10(b) of the Exchange Act**

**[15 U.S.C. § 78j(b) and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

49.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 48 as if fully set forth herein.

50.   From 1999 through the present, Defendants Altenbach and GT, as active participants in the scheme or conspiracy, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly;

    a.   employed devices, schemes and artifices to defraud;

    b.   made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.      engaged in acts, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities.

all as more particularly described above.

51.     Defendants drafted and prepared numerous agreements for UCAP and its subsidiaries that Defendants knew would be used in SEC filings and relied upon by the plaintiffs. Those filings were replete with false and misleading information which Defendants knew, or should have known, were false. Specifically, even after Defendant Altenbach was given actual notice of significant accounting irregularities in the fall of 2003, he actively advised against disclosing the irregularities in a Form 8K before preparing the agreements pursuant to which Homm invested.

52.     Defendants' actions during this period of time were reckless, establishing that GT acted with scienter, since Altenbach and GT knew, or in the exercise of slight diligence, should have known of the complete lack of internal controls at UCAP, the related party transfers, the issuance of shares to insiders without consideration, the lack of an audit committee, the concern over net worth calculations in connection with the warehouse line, the

mispriced and illegal stock options, the sham real estate transactions and all of the issues set forth above.

53.     The facts set forth above evidence a clear pattern of Defendants engaging in a conscious pattern of breaching their fiduciary duties to UCAP and actively assisting the Arkansas Four in the following activities:

a)     unauthorized and improper issuance of stock in UCAP to various individuals and entities;

b)     transfer or conveyance of UCAP property for less than fair market value or through related party transactions;

c)     creation of fictitious debt for UCAP without adequate consideration,

d)     signing lucrative insider consulting agreements; and

e)     self-dealing on the sale and transfer of UCAP assets, real estate and stock.

54.     As a direct and proximate result of these omissions and misstatements, the public securities filings made by UCAP for the period from 1999 until the present, were false, misleading and constitute violations of federal and state securities laws.

55.     Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

56.     By reason of the foregoing, Defendants, directly and indirectly, violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b) and Rule 10b-5 thereunder [17 C.F.R. § 240 10b-5].

57.     At all times relevant herein. Defendants took these actions and made these representations knowing them to be false, or with reckless disregard for the truth or omitted to state material facts with the intent to induce Plaintiffs to invest in UCAP.

58.     The actions taken by Defendants include:

> a) Participating in insider trading, taking advantage of the artificial price and volume in the stock of UCAP for the benefit of themselves and their family and friends;
>
> b) Using the false and misleading financial reports to hide over $30 million in losses, and glorified financial forecasts, to

induce further investment, including investments by Homm, et al, and McAdams;

c) Using false and misleading financial reports, to induce Smyth to enter into a settlement of multi-million dollar litigation, spending hundreds of thousands of dollars on legal fees without proper disclosure of the material events;

d) Failing to follow proper reporting according to the Securities Act of 1933, the Securities Exchange Act of 1934 and the Sarbanes-Oxley Act, as required by federal law, ultimately leading to the delisting of UCAP by the SEC as a public company traded on the OTC BB, erasing any value that might otherwise been available via the public market and creating substantial risk of future liabilities from subsequent claims;

59.     Plaintiffs, at the time these representations were made by Defendants, were unaware of the falsity of the representations and believed them to be true and complete. In reliance upon these representations, Plaintiffs invested in UCAP. Had Plaintiffs known the actual facts and risks as set forth above, they would not have ever invested in UCAP. The omission of material facts by Defendants altered the mix of information available to the Plaintiffs they were weighing in making a decision of whether or not to invest in UCAP. Had Plaintiffs known of the omission material facts as set forth above, they

would have never invested in UCAP, Defendants knew, or reasonably should have known, that the misrepresentations of fact were untrue at the time they were made, or, knowing the truth or falsity of the statements made, represented them to be true as more particularly described above. Plaintiffs justifiably relied on the verbal and written material misrepresentations of fact made by Defendants before deciding to invest in UCAP. Had the Plaintiffs known of the material misrepresentations of fact, this would have been material to Plaintiffs decision to invest in UCAP, and the Plaintiffs would not have invested in UCAP.

60.    Defendants' actions violated the federal securities laws by inducing Plaintiffs and others to purchase UCAP securities based upon material misstatements of fact and omissions.

61.    As a direct and proximate result of Defendants' fraudulent misrepresentations and omission of material facts, Plaintiffs have been damaged in amounts to be determined at trial but which exceed $10 million. Plaintiffs are entitled to judgment to the full extent allowable by the law, for pre and post judgment interest and for all other further relief as the Court may deem just and proper.

## COUNT II

## **COMMON LAW FRAUD**

62.     Plaintiffs incorporate by reference the allegations in paragraphs 1 through 61 as if fully set forth herein.

63.     Defendants, jointly and severally, made, and were solely responsible for making, verbal and written, false and misleading statements about UCAP, intending that the Plaintiffs rely thereon before deciding to make their respective investments in UCAP

64.     Defendants knew, or reasonably should have known that the misrepresentations of fact were untrue at the time they or made, or, know knowing the truth or falsity of the statements made, represented them to be true as more particularly described above.

65.     Plaintiffs justifiably relied on the verbal and written material misrepresentations of fact made by Defendants before deciding to invest in UCAP. Had the Plaintiffs known of the material misrepresentations of fact, this would have been material to Plaintiffs decision to invest in UCAP, and the Plaintiffs would not have invested in UCAP.

66.    As a direct and proximate result of Defendants' fraudulent misstatements of material facts, Plaintiffs have been damaged in an amount in excess of $10 million  Plaintiffs are entitled to judgment to the full extent allowable by the law, for pre and post judgment interest and for all other further relief as the Court may deem just and proper.

67.    Defendants omitted material matters of fact that altered the mix of information available to Plaintiffs before deciding to invest in UCAP.

68.    Defendants' omission of facts were material in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.    Defendants had a duty to disclose to Plaintiffs the material omitted facts as alleged above. Had Defendants disclosed the omitted facts as alleged above, this would have been material to Plaintiffs' decision to invest in UCAP and Plaintiffs would not have invested in UCAP.

70.    As a direct result of the Defendants' omissions of material fact, Plaintiffs have been damaged in excess of $10 million. Plaintiffs are entitled to judgment to the full extent allowable by the law, for pre and post judgment interest and for all other further relief as the Court may deem just and proper.

## COUNT III

71.    Plaintiffs reincorporate and reallege paragraphs 1 through 70 of the Complaint as if set forth fully herein.

72.    Plaintiffs McAdams and JBM were third-party beneficiaries of the contract between Defendant GT and the title company concerning the status of title to the Swiss Air property

73.    Plaintiffs McAdams and JBM, in reliance of Defendant GT's contract with the title company, invested $1,850,000 in UCAP. Plaintiffs would not have invested without Defendant GT's contract of indemnity.

74.    GT has breached the contract by failing to provide clear title for the Swiss Air property or reimburse Plaintiffs.

75.    As third-party beneficiaries, Plaintiffs McAdams and JBM have suffered actual damages resulting from the breach in the sum of $1,850,000.

## COUNT IV

76.    Plaintiffs reincorporate and reallege paragraphs 1 through 75 of the Complaint as if set forth fully herein.

77.    Defendant Altenbach guaranteed an obligation of UCAP to Plaintiff McAdams in order to induce Plaintiff McAdams to invest in excess of $500,000 in UCAP.

78.     Defendant Altenbach has breached the terms of the guaranty by refusing to pay Plaintiff McAdams, despite demand.

79.     Defendant Altenbach owes Plaintiff McAdams in excess of $500,000 for breaches of his guaranty.

**WHEREFORE**, Plaintiffs ask this Court to:

a)     Issue summons and serve the Defendant;

b)     Award them a judgment against Defendant, jointly and severally, for their actual damages in an amount to be determined by a jury but not less than $10 million;

c)     Assess punitive damages in an amount to be determined by a jury, but no less than $30 million;

d)     Award them costs, expenses and attorneys' fees;

e)     Grant them a jury trial; and

f)      Grant them such other and further relief, as the Court may deem

necessary.

This the 28 day of July, 2006.

                                    LIGHTMAS & DELK
                                    By: _Glenn A. Delk_
                                        Glenn A. Delk
                                        Georgia Bar No. 216950
                                        Attorneys for Plaintiffs

Suite 1150, The Peachtree
1355 Peachtree St., N.E.
Atlanta, Georgia 30309
(404) 876-3335 — Telephone
(404) 876-3338 — Telecopier